# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

WALTER LEE CHANEY,

          Plaintiff,

   v.

NANCY A. BERRYHILL,
Acting Commissioner of Social Security,

          Defendant.

_____/

Case No. 1:18-cv-00171-SKO

ORDER ON PLAINTIFF'S SOCIAL
SECURITY COMPLAINT

(Doc. 1)

## I.  INTRODUCTION

On February 1, 2018, Plaintiff Walter Lee Chaney ("Plaintiff") filed a complaint under 42 U.S.C. §§405(g) and 1383(c) seeking judicial review of a final decision of the Commissioner of Social Security (the "Commissioner" or "Defendant") denying his applications for disability insurance benefits ("DIB") and Supplemental Security Income (SSI).  (Doc. 1.)  The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to the Honorable Sheila K. Oberto, United States Magistrate Judge.[1]

---

[1] The parties consented to the jurisdiction of a U.S. Magistrate Judge.  (Docs. 6, 7.)

## II.    BACKGROUND

Plaintiff was born on September 2, 1975, and obtained a General Educational Development (GED) certificate.  (Administrative Record ("AR") 40, 226, 233, 251, 257, 280, 302.)  On July 21, 2014, Plaintiff filed claims for DIB and SSI payments, alleging disability beginning on August 17, 2011, due to pain in his left ankle and knees.  (AR 30, 36, 75, 87, 101, 119, 226–36, 256, 270.)

**A.    Relevant Medical Evidence[2]**

**1.    Left Ankle Fracture**

In November 2011, Plaintiff presented to the emergency department for evaluation of pain and swelling to his left ankle after wrestling on a grassy surface.  (AR 347).  X-rays revealed a left ankle fibular fracture.   (AR 346–47.)  Plaintiff underwent left ankle surgery in December 2011.  (AR 342–43.)  The next month, on January 11, 2012, Bradley Smith, M.D., reported that Plaintiff was making "significant" and "satisfactory" progress.  (AR 328–29.)  X-rays of Plaintiff's ankle showed "excellent alignment and position."  (AR 328.)  Dr. Smith referred Plaintiff to physical therapy and noted that Plaintiff may start "weaning" out of the stabilizing boot and off crutches.  (AR 329.)

Additional x-rays in May 2012 showed no evidence of loosening fixation screws or pins in Plaintiff's left ankle.  (AR 336.)  In August 2012, Plaintiff complained of pain in his left ankle.  (AR 630.)  Dr. Smith noted an interfragmentary screw that was "prominent," "causing [Plaintiff] difficulty with activities and footwear."  (AR 630.)  Plaintiff reported "no mechanical symptoms" and denied parasthesias.   (AR 630.)   Dr. Smith noted that Plaintiff was "doing well," yet recommended that the interfragmentary screw be removed and the other hardware be left intact.  (AR 631.)  That surgery was performed on August 24, 2012.  (AR 635–36.)

**2.    Left Knee Injury**

Plaintiff twisted his left knee in June 2013 and "immediately felt some pain and a pop." (AR 395, 618–20.)  X-rays taken that month showed "a new faint linear calcification projecting near the tibia along the lateral border of the intercondylar notch," which "may be a small avulsion

---

[2] As Plaintiff alleges that that ALJ erred in three ways: (1) he did not properly consider the opinion of Plaintiff's treating nurse practitioner; (2) his credibility determination is deficient; and (3) he improperly rejected third-party lay testimony.  Accordingly, only evidence relevant to these arguments is set forth below.

fracture associated with [an] ACL tear." (AR 622.) Plaintiff was observed to have a "steady" gait on August 8, 2013. (AR 610.) In September 2013, Plaintiff demonstrated a range of motion in his left knee of approximately five and 90 degrees. (AR 395.) He was recommended to undergo six weeks of physical therapy to increase his range of motion and to avoid arthrofibrosis. (AR 396.) Plaintiff was evaluated for physical therapy on November 7, 2013 and was noted to have a normal gait. (AR 371.) Plaintiff still complained of pain in his knee in January 2014 and was provided a knee brace in May 2014. (AR 383, 385.)

On September 3, 2014, Plaintiff presented with left knee pain. (AR 379.) An MRI scan was reviewed and showed a medial meniscal tear and ACL rupture. (AR 380.) On September 23, 2014, Ken Erickson, Family Nurse Practitioner ("F.N.P."), reported that Plaintiff needed surgery in his left knee to repair the ligament and remove cartilage, but that Plaintiff's prognosis would be "good after surgery." (AR 408–09.) Two days later, on September 25, 2014, F.N.P. Erickson completed a medical source statement wherein he opined that Plaintiff could not lift and/or carry more than 10 pounds occasionally, could stand and/or walk less than two hours in an eight-hour workday, and could sit less than six hours in an eight-hour workday. (AR 405.) F.N.P. Erickson opined that Plaintiff was limited to frequent manipulative activities, required an assistive device to ambulate, and needed to alternate between sitting and standing. (AR 405–406.) According to F.N.P. Erickson, Plaintiff could occasionally balance, but never climb, stoop, kneel, crouch, or crawl, and should avoid heights, moving machinery, temperature extremes, chemicals, and dust. (AR 406.) F.N.P. Erickson again noted that Plaintiff's prognosis was "good after surgery." (AR 406.)

Plaintiff underwent left knee surgery on October 6, 2014. (AR 418–19, 938–39.) While recovering from surgery, in December 2014, he injured his left knee again, and was observed to have a large effusion. (AR 427–29.) Plaintiff complained on January 2, 2015, that his knee "locks up on him when he sits[,] and it swells when he tries to put pressure on it." (AR 442.) He was recommended to continue to use his knee brace and crutches to ambulate. (AR 447.)

Later that month, on January 23, 2015, treating orthopedist William Pistel, D.O., noted that although Plaintiff was "doing fairly well," he had not yet started physical therapy, which was "very

frustrating." (AR 888.) Plaintiff was evaluated for physical therapy on January 29, 2015, where his gait was observed to have "minimal deviations." (AR 902.)

In May 2015, while Plaintiff was "rehabbing very well" (AR 959), he was exiting his car when he heard a "pop" and experienced swelling in his left knee. (AR 935, 940, 964.) An MRI of Plaintiff's left knee performed June 1, 2015, showed a re-tear of the ACL graft. (AR 935, 941, 970–71, 981.) He underwent another left knee surgery on January 7, 2016. (AR 935–37, 980–84.)

On March 16, 2016, treating surgeon Jonathan Pettegrew, M.D., noted that Plaintiff was "doing well," with no pain at rest and no instability. (AR 928.) Dr. Pettigrew noted some stiffness and pain with prolonged activity and occasional popping beneath the patella. (AR 928). On April 13, 2016, Dr. Pettigrew noted Plaintiff is "doing well," "progressing appropriately," had no pain throughout the day, and had returned to physical therapy. (AR 927.)

In October 2016, Plaintiff reported he was "doing pretty well," but had weakness in his left knee and leg. (AR 1270.) Upon examination, Plaintiff had negative orthopedic signs, stability in his knee, good range of motion passive and actively, but atrophy of his left quad. (AR 1270.) He was prescribed physical therapy for strengthening of his quad, hamstring, and hip abductors. (AR 1271.)

### 3. Right Knee Pain

In early 2015, Plaintiff complained of right knee pain. (AR 893.) An MRI of Plaintiff's right knee on March 2, 2015, showed "mild to moderate chondromalacia"[3] of the patellofemoral joint and a "focal delaminating[4] injury of the weightbearing medial femoral condylar cartilage." (AR 893). No "internal derangement"[5] or osteochondral fragmentation were found. (AR 893.) Examination of Plaintiff's right knee on March 13, 2015, demonstrated a negative dial test and negative varus and valgus stress tests. (AR 883–84.) Plaintiff had full flexion and extension. (AR 884.) He was prescribed ibuprofen for pain and recommended to add quad-strengthening exercises to his physical therapy regimen. (AR 884.)

---

[3] Chondromalacia is the "softening of the articular cartilage, most frequently in the patella." Dorland's Illustrated Medical Dictionary at 359 (31st ed.2007) (hereinafter Dorland's).
[4] Delamination is the "separation into layers." Dorland's at 489.
[5] Derangement is a "partial dislocation of the knee, marked by great pain and spasm of the muscles." Dorland's at 500.

### 4. Consultative Examiner Michael Cohn, PhD

On April 15, 2015, psychologist Dr. Cohn performed a comprehensive psychiatric examination of Plaintiff. (AR 905–909.) He observed Plaintiff to be appropriately dressed and cooperative throughout the examination. (AR 905.)

Plaintiff complained of depression and anxiety that is made worse by "being around people." (AR 905.) He lives with his girlfriend and their two children. (AR 906.) Plaintiff reported that he is able to take care of personal hygiene tasks, including dressing and bathing without difficulty. (AR 906.) He is able to pay bills, handle cash appropriately, and go out alone without difficulty. (AR 906.) Plaintiff reports his relationships with family and friends is "fair." (AR 906.) He has no difficulty completing household tasks or making daily decisions. (AR 906.) Plaintiff reported that on a daily basis, he wakes up, performs personal hygiene, watches television, eats, and sleeps. (AR 906.) Dr. Cohn observed Plaintiff to be "genuine" and "truthful," with no evidence of exaggeration. (AR 906.)

Plaintiff's mental status examination was normal. (AR 906–908.) Dr. Cohn found no evidence of anxiety or depression and deemed his psychiatric prognosis good. (AR 908.) He also concluded that Plaintiff had no significant mental limitations. (AR 908–909.)

### 5. State Agency Physicians Opinions

On October 29, 2014, R. Fast, M.D., a state agency physician, reviewed the record and assessed Plaintiff's residual functional capacity [RFC].[6] (AR 83–84.) Dr. Fast found that Plaintiff could (1) occasionally lift and/or carry 50 pounds and frequently lift and/or carry 25 pounds; (2) stand and/or walk for about six hours in an eight-hour workday; (3) sit for about six hours in an eight-hour workday; and (4) perform unlimited pushing/pulling with the upper and lower extremities, subject to the lift and carry restrictions. (AR 83.) Dr. Fast found that Plaintiff could

---

[6] RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis of 8 hours a day, for 5 days a week, or an equivalent work schedule. TITLES II & XVI: ASSESSING RESIDUAL FUNCTIONAL CAPACITY IN INITIAL CLAIMS, Social Security Ruling ("SSR") 96-8P (S.S.A. July 2, 1996). The RFC assessment considers only functional limitations and restrictions that result from an individual's medically determinable impairment or combination of impairments. *Id.* "In determining a claimant's RFC, an ALJ must consider all relevant evidence in the record including, inter alia, medical records, lay evidence, and 'the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment.'" *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006)

frequently climb, kneel, crouch, and crawl, with no other limitations. (AR 83–84.)

Upon reconsideration on April 15, 2015, another state agency physician, H. Samplay, M.D., reviewed the record and assessed Plaintiff's RFC. (AR 114–115.) Dr. Samplay opined that Plaintiff could: (1) occasionally lift and/or carry 20 pounds and frequently lift and/or carry 10 pounds; (2) stand and/or walk for about six hours in an eight-hour workday; (3) sit for about six hours in an eight-hour workday; and (4) perform unlimited pushing/pulling with the upper and lower extremities, subject to the lift and carry restrictions. (AR 114.) According to Dr. Samplay, Plaintiff was limited to: (1) occasional kneeling, crouching, crawling, and climbing of ramps or stairs; (2) frequent balancing; and (3) no climbing of ladders, ropes, or scaffolds. (AR 115.)

**B.      Plaintiff's Statements**

On September 22, 2014, Plaintiff completed a "Pain Questionnaire," in which he complained of pain in his left ankle and left knee that began in August 2011 and June 2012, respectively. (AR 270.) According to Plaintiff, the pain occurs when he stands and sits for long periods of time, when he walks short distances, and with changes in the weather. (AR 270.) He stated that the pain lasts throughout the day and that only sleeping relieves the pain. (AR 270, 271.) Plaintiff also stated he takes medication for the pain but experiences no relief. (AR 270–71.) He experiences drowsiness and is "spaced out" as a result of his medication. (AR 271.) Plaintiff noted that he had an upcoming surgery scheduled in October 2014 and stated that he uses a knee brace and crutches to ambulate because of pain. (AR 271.)

According to Plaintiff, he must stop an activity every 30 minutes because of pain. (AR 272.) Plaintiff stated that as of October 6, 2014 (the date of his scheduled surgery), he can walk "5 to 10 minutes" outside his home, that he can stand five minutes and sit one hour at a time, that his girlfriend drives him to perform errands, and that he needs assistance cooking, changing his clothes, and bathing "after October 6." (AR 272.)

On April 1, 2015, Plaintiff completed an Adult Function Report. (AR 282–90.) He stated he lives in an apartment with family members. (AR 282.) According to Plaintiff, the medicine he takes "prohibits [him] from handling heavy machinery or driv[ing]" because it causes him to be "either sleepy or jittery/uncoordinated." (AR 282.) When asked to describe what he did from the

time he wakes up to the time he goes to bed, Plaintiff reported he is either in bed due to fatigue from medication or sitting down due to imbalance. (AR 283–84.) Plaintiff reported that he cannot sleep because his mind races, but that his medicine makes him drowsy. (AR 283.) He needs reminders to brush his teeth and to bathe. (AR 285.) Plaintiff does not perform house or yard work due to knee pain. (AR 285.) He does not prepare meals because he is "always drowsey [sic]." (AR 285.)

When Plaintiff goes outside, he uses either public transportation ("Dial-a-Ride") or rides in a car. (AR 286.) He does not drive because of the effects of his medication. (AR 286.) Plaintiff's hobbies and interests include watching television and sleeping, which he does every day. (AR 287.) He has to be reminded to attend doctor's appointments and needs someone to accompany him. (AR 287.) Plaintiff does not get along with his family and does not socialize. (AR 288.) He reports that he has stop walking after five minutes. (AR 288.) He uses crutches, a walker, and a wheelchair when it "hurts to walk." (AR 289.) Plaintiff reports his medications make him dizzy and drowsy. (AR 290.)

## C.     Plaintiff's Girlfriend's Statement

On April 4, 2015, Plaintiff's girlfriend Kathy Pink completed a Third-Party Adult Function Report. (AR 292–301.) Ms. Pink reported that she has known Plaintiff almost 12 years and spends every day with him when she's not at work. (AR 292.) She states that Plaintiff doesn't "have the will to get up sometimes and always depressed." (AR 292.) During a typical day, Plaintiff wakes up and lays on the couch until she tells him to get dressed. (AR 293.) He "always looks spaced out and unbalanced on his knee." (AR 293.) According to Ms. Pink, Plaintiff walks around the house at night and goes "in and out of the garage door" instead of sleeping. (AR 293.) Ms. Pink reported that Plaintiff "wears the same clothes for days," bathes "once or twice a week," and eats when she returns home from work. (AR 293.) She has to remind him to brush his teeth, to bathe, and to take his medication. (AR 294.)

According to Ms. Pink, Plaintiff "rarely" prepares food or meals because he is "always drowsey [sic] and unbalanced." (AR 294.) He does not perform house or yard work due to his medication. (AR 294–95.) Ms. Pink reported that Plaintiff does not go outside that much because

he says he's tired.  (AR 295.)  Plaintiff rides in a car and uses transportation but does not go out alone because "[h]e has anxiety and he acts like everybody is looking at him."  (AR 295.)  He does not drive due to his medication.  (AR 295.)  Ms. Pink reported Plaintiff does not shop because he does not like to be around a lot of people.  (AR 295.)  He is not able to handle money because he doesn't "have a job or income" and hasn't "held a job [for] over 10 years."  (AR 295.)

Plaintiff's hobbies and interests include going to the gym and socializing, but that he doesn't do those activities because "his knees swell" and his medication makes him drowsy.  (AR 295.) Ms. Pink reported that Plaintiff does not engage in any social activities and instead stays on the couch.  (AR 296.)  According to Ms. Pink, Plaintiff "had a lot of friends" but now doesn't trust anyone.  (AR 297.)  Ms. Pink stated that Plaintiff has to stop walking after five minutes and has to rest "a couple of minutes."  (AR 297.)  Plaintiff's medication makes him dizzy.  (AR 297.)

Plaintiff has a short attention span and does not finish what he starts.  (AR 297.)  According to Ms. Pink, Plaintiff has been arrested more than five times for resisting arrest and was fired from his last job when he stopped going due to anxiety and forgetfulness.  (AR 298–99.)  He does not handle stress well: he was "dropped" from his doctor because the doctor felt "threatened."  (AR 298.)  As far as handling changes in routine, Ms. Pink stated Plaintiff "freaks out and usually shuts down" and he "doesn't like being around people he doesn't know."  (AR 298.)

Ms. Pink reported that Plaintiff uses crutches, a cane, and a brace, all of which were prescribed by a doctor "when he broke his ankle and tore his ACL & MCL."  (AR 298.)  Plaintiff uses these aids "when his knees hurt and swell."  (AR 298.)  According to Ms. Pink, the side effects of Plaintiff's medications include dizziness (causing him to fall), trouble concentrating, and anxiety.  (AR 300.)

**D.** **Administrative Proceedings**

The Commissioner denied Plaintiff's application for benefits initially on October 30, 2014, and again on reconsideration on May 15, 2015.  (AR 141–51, 155–68.)  Consequently, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  (AR 169–77.)  At the hearing on February 13, 2017, Plaintiff appeared with counsel and testified before an ALJ as to his alleged disabling conditions.  (AR 50–67.)

### 1.    Plaintiff's Testimony

Plaintiff arrived at the hearing using a cane for his left knee.  (AR 50–51.)  According to Plaintiff, he started using the cane in 2015, following his second knee surgery, for stability.  (AR 64.)  He testified that he has used an assistive device for ambulation at least 85% of the time since 2011.  (AR 66.)  Plaintiff complained of pain in his left leg, left ankle, low back and hips, and right knee.  (AR 52.)  He has pain and a lack of balance in his left leg and testified he falls once or twice a month.  (AR 66.)

Plaintiff stated he takes medication that makes him tired, including Seroquel for anxiety.  (AR 54.)  He was prescribed Seroquel by his primary care physician and testified that his insurance does not allow mental health treatment to treat his anxiety.  (AR 55.)  Plaintiff testified that he is receiving treatment for depression and anxiety with therapy sessions, with his last session occurring in October 2016.  (AR 67.)

Plaintiff testified he lives with his girlfriend who cooks, shops, and cleans the house for him.  (AR 56, 58.)  His two children also live with them and they are homeschooled by their mother.  (AR 61.)  According to Plaintiff, he does not drive and no longer has a license due to unpaid child support; his girlfriend drives him places.  (AR 56–57.)  He watches television and uses a laptop.  (AR 57–58.) Plaintiff testified that he sometimes will accompany his girlfriend to the store but will sit in the car and "look at the phone."  (AR 59.)  His girlfriend drive him and their kids to Reno at the end of 2016.  (AR 59–60.)  Plaintiff testified that his girlfriend had to pull over every thirty minutes due to their son's carsickness and that they stayed in Reno only one day.  (AR 60–61.)

Although Plaintiff's alleged onset date is August 17, 2011, he worked for three months as a tax preparer for H&R Block in 2012 and 2013.  (AR 52–53, 237, 244, 249.)  He testified he "wasn't really comfortable with it" because he was "anxious" and "not used to dealing with people."  (AR 53.)  In 2014, Plaintiff worked a temporary job but stopped due to his leg being "messed up."  (AR 53.)

### 2.    Vocational Expert's Testimony

A Vocational Expert ("VE") testified at the hearing that she had identified Plaintiff's past

relevant work as: a material handler, Dictionary of Operational Titles (DOT) code 929.687-030, which was heavy exertional work with a specific vocational preparation (SVP) [7] of 3; as a cellar worker, DOT code 914.665-014, which was heavy exertional work with a SVP of 3; and as a laborer/building maintenance, DOT code 381.687-014, which was heavy exertional work, medium as performed, with a SVP of 2. (AR 68–70, 326.) The ALJ asked the VE in the first hypothetical to consider a person of Plaintiff's age, education, and work history, who is capable of performing at the sedentary level. (AR 70.) The VE was also to assume this person was limited to lifting and carrying no more than five pounds occasionally, sitting six hours but standing and/or walking no more than two hours each; never climbing, balancing, stooping, kneeling, crouching, or crawling; never working around hazards or operating motor vehicles; and needing numerous unscheduled rest breaks in addition to regular breaks, causing the employee to be off task 15% of the workday. (AR 70–71.) The VE testified that no full-time jobs were available for that person. (AR 71.)

In the second hypothetical posed, the VE was asked to consider a person of Plaintiff's age, education, and work history, who was limited to unskilled, light work. (AR 71.) The person was assumed to have additional limitations such as never climbing ladders, ropes, or scaffolds; occasionally kneeling, crouching, or crawling; frequently balancing or stooping; and never working around hazards or operating motor vehicles. (AR 71.) The VE testified that such a person could not perform Plaintiff's past relevant work, but could perform other work in the national economy such as: clerk cashier, DOT code 211.462-010, light exertional work with a SVP of 2, and with 3,922,000 jobs available nationally; agricultural grader and sorter, DOT code 529.687-186, light exertional work with a SVP of 2, with 500,000 jobs available in the national economy; and assembler (small parts), DOT code 706.684-022, light exertional work with a SVP of 2, with 1,500,000 jobs available nationally. (AR 71.)

In the third hypothetical, the VE was asked to consider the person in the second hypothetical but include the additional limitation of occasional contact with the public, coworkers, and

---

[7] Specific vocational preparation, as defined in DOT, App. C, is the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation. DOT, Appendix C – Components of the Definition Trailer, 1991 WL 688702 (1991). Jobs in the DOT are assigned SVP levels ranging from 1 (the lowest level – "short demonstration only") to 9 (the highest level – over 10 years of preparation). *Id.*

supervisors. (AR 71–72.) The VE testified that the limitation would remove the clerk cashier job, but that such an individual could perform the occupation of egg washer, DOT code 528.686-030, light exertional work with a SVP of 1, with 95,790 jobs available in the national economy. (AR 72.)

Plaintiff's counsel then asked the VE to consider the ALJ's third hypothetical person with the additional limitation of standing and walking less than two hours and inquired whether that person could work any sedentary jobs. (AR 72–73.) The VE testified that such person could not perform any sedentary jobs per the DOT. (AR 73.)

**E.      The ALJ's Decision**

In a decision dated April 5, 2017, the ALJ found that Plaintiff was not disabled. (AR 32–41.) The ALJ conducted the five-step disability analysis set forth in 20 C.F.R. §§ 404.1520 and 416.920. (AR 14–23.) The ALJ decided that Plaintiff had not engaged in substantial gainful activity since August 17, 2011, the alleged onset date (Step One). (AR 32.) At Step Two, the ALJ found Plaintiff's following impairments to be severe: left knee disorder status post surgeries; left fibula fracture status post surgeries; and right knee disorder. (AR 32–35.) Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings") (Step Three). (AR 35–36.)

The ALJ then assessed Plaintiff's RFC and applied the RFC assessment at Steps Four and Five. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4) ("Before we go from step three to step four, we assess your residual functional capacity . . . . We use this residual functional capacity assessment at both step four and step five when we evaluate your claim at these steps."). The ALJ determined that Plaintiff had the RFC:

> to perform light work as defined in 20 C.F.R. [§§] 404.1567(b) and 416.967(b), but he can never climb ladders, ropes, or scaffolds. He can only occasionally kneel, crouch, crawl, and climb ramps and stairs. He is limited to no more than frequent balancing and stooping. He can never work around hazards, such as moving dangerous machinery and unprotected heights. In addition, he cannot operate motor vehicles.

(AR 36.) Although the ALJ recognized that Plaintiff's impairments "could reasonably be expected to cause the alleged symptoms[,]" he rejected Plaintiff's subjective testimony as "not entirely consistent with the medical evidence and other evidence in the record . . . ." (AR 36.)

The ALJ determined Plaintiff had no past relevant work (AR 40), but that Plaintiff was not disabled because, given his RFC, he could perform a significant number of other jobs in the local and national economies, specifically clerk cashier, agricultural sorter, and assembler (small parts). (AR 40–41.)

Plaintiff sought review of this decision before the Appeals Council, which denied review on November 30, 2017. (AR 1–6.) Therefore, the ALJ's decision became the final decision of the Commissioner. 20 C.F.R. §§ 404.981, 416.1481.

## III. LEGAL STANDARD

### A. Applicable Law

An individual is considered "disabled" for purposes of disability benefits if he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). However, "[a]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id.* § 423(d)(2)(A).

"The Social Security Regulations set out a five-step sequential process for determining whether a claimant is disabled within the meaning of the Social Security Act." *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999) (citing 20 C.F.R. § 404.1520); *see also* 20 C.F.R. § 416.920. The Ninth Circuit has provided the following description of the sequential evaluation analysis:

> In step one, the ALJ determines whether a claimant is currently engaged in substantial gainful activity. If so, the claimant is not disabled. If not, the ALJ proceeds to step two and evaluates whether the claimant has a medically severe impairment or combination of impairments. If not, the claimant is not disabled. If so, the ALJ proceeds to step three and considers whether the impairment or combination of impairments meets or equals a listed impairment under 20 C.F.R. pt.

404, subpt. P, [a]pp. 1.  If so, the claimant is automatically presumed disabled.  If not, the ALJ proceeds to step four and assesses whether the claimant is capable of performing her past relevant work.  If so, the claimant is not disabled.  If not, the ALJ proceeds to step five and examines whether the claimant has the [RFC] . . . to perform any other substantial gainful activity in the national economy.  If so, the claimant is not disabled.  If not, the claimant is disabled.

*Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005); *see, e.g.*, 20 C.F.R. § 416.920(a)(4) (providing the "five-step sequential evaluation process" for SSI claimants).  "If a claimant is found to be 'disabled' or 'not disabled' at any step in the sequence, there is no need to consider subsequent steps." *Tackett*, 180 F.3d at 1098 (citing 20 C.F.R. § 404.1520); 20 C.F.R. § 416.920.

"The claimant carries the initial burden of proving a disability in steps one through four of the analysis." *Burch*, 400 F.3d at 679 (citing *Swenson v. Sullivan*, 876 F.2d 683, 687 (9th Cir. 1989)).  "However, if a claimant establishes an inability to continue [his] past work, the burden shifts to the Commissioner in step five to show that the claimant can perform other substantial gainful work." *Id.* (citing *Swenson*, 876 F.2d at 687).

**B.    Scope of Review**

"This court may set aside the Commissioner's denial of [social security] benefits [only] when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole." *Tackett*, 180 F.3d at 1097 (citation omitted).  "Substantial evidence is defined as being more than a mere scintilla, but less than a preponderance." *Edlund v. Massanari*, 253 F.3d 1152, 1156 (9th Cir. 2001) (citing *Tackett*, 180 F.3d at 1098).  "Put another way, substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

"This is a highly deferential standard of review . . . ." *Valentine v. Comm'r of Soc. Sec. Admin.*, 574 F.3d 685, 690 (9th Cir. 2009).  "The ALJ's findings will be upheld if supported by inferences reasonably drawn from the record." *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008) (citation omitted).  Additionally, "[t]he court will uphold the ALJ's conclusion when the evidence is susceptible to more than one rational interpretation." *Id.*; *see, e.g.*, *Edlund*, 253 F.3d at 1156 ("If the evidence is susceptible to more than one rational interpretation, the court may not substitute its judgment for that of the Commissioner." (citations omitted)).

Nonetheless, "the Commissioner's decision 'cannot be affirmed simply by isolating a specific quantum of supporting evidence.'" *Tackett*, 180 F.3d at 1098 (quoting *Sousa v. Callahan*, 143 F.3d 1240, 1243 (9th Cir. 1998)). "Rather, a court must 'consider the record as a whole, weighing both evidence that supports and evidence that detracts from the [Commissioner's] conclusion.'" *Id.* (quoting *Penny v. Sullivan*, 2 F.3d 953, 956 (9th Cir. 1993)).

Finally, courts "may not reverse an ALJ's decision on account of an error that is harmless." *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012) (citing *Stout v. Comm'r, Soc. Sec. Admin.*, 454 F.3d 1050, 1055–56 (9th Cir. 2006)). Harmless error "exists when it is clear from the record that 'the ALJ's error was inconsequential to the ultimate nondisability determination.'" *Tommasetti*, 533 F.3d at 1038 (quoting *Robbins*, 466 F.3d at 885). "[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination." *Shinseki v. Sanders*, 556 U.S. 396, 409 (2009) (citations omitted).

The ALJ's decision denying benefits "will be disturbed only if that decision is not supported by substantial evidence or it is based upon legal error." *Tidwell v. Apfel*, 161 F.3d 599, 601 (9th Cir. 1999). In reviewing the Commissioner's decision, the Court may not substitute its judgment for that of the Commissioner. *Macri v. Chater*, 93 F.3d 540, 543 (9th Cir. 1996). Instead, the Court must determine whether the Commissioner applied the proper legal standards and whether substantial evidence exists in the record to support the Commissioner's findings. *See Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401 (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)). "Substantial evidence is more than a mere scintilla but less than a preponderance." *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008). The Court "must consider the entire record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion, and may not affirm simply by isolating a specific quantum of supporting evidence." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007) (citation and internal quotation marks omitted).

# IV.    DISCUSSION

Plaintiff contends that the ALJ erred in three ways, all of which resulted in an insufficient finding at Step Five.  First, Plaintiff claims the ALJ erred in his treatment of the opinion of F.N.P. Erickson.  (*See* Doc. 17 at 7–9; Doc. 21 at 2–3.)  Second, Plaintiff asserts that the ALJ failed to articulate clear and convincing reasons for discounting Plaintiff's testimony and statements regarding his subjective complaints.  (*See* Doc. 17 at 10–12; Doc. 21 at 4–5.)  Finally, Plaintiff contends that the ALJ erred in improperly disregarding Plaintiff's girlfriend's statement.  (*See* Doc. 17 at 12–14; Doc. 21 at 6–7.)

Defendant counters that that the ALJ's Step Five finding was error-free, as he properly rejected F.N.P. Erickson's opinion as unsupported by and inconsistent with the objective medical evidence in the record, and properly relied on evidence in the record that undermined the credibility of Plaintiff's allegations of disabling symptoms and his girlfriend's similar statements.  (*See* Doc. 19 at 7–14.)

## A.    The ALJ Appropriately Assessed the Opinion of F.N.P. Erickson

### 1.    Legal Standard

While only "acceptable medical sources" can diagnose and establish that a medical impairment exists, evidence from "other sources" can be used to determine the severity of that impairment and how it affects the claimant's ability to work.  20 C.F.R. §§ 404.1527(f), 416.927(f).  At the time Plaintiff filed his claims, in 2014, nonacceptable medical sources included physician's assistants, counselors, and nurse practitioners.  20 C.F.R. §§ 404.1502(a), 416.902(a); TITLES II & XVI: II & XVI: CONSIDERING OPINIONS & OTHER EVIDENCE FROM SOURCES WHO ARE NOT "ACCEPTABLE MED. SOURCES" IN DISABILITY CLAIMS; CONSIDERING DECISIONS ON DISABILITY BY OTHER GOVERNMENTAL & NONGOVERNMENTAL AGENCIES, Social Security Ruling ("SSR") 06-03p (S.S.A. Aug. 9, 2006), 2006 WL 2329939.  To disregard the opinion of a nonacceptable medical, or lay, source, the ALJ need only provide a reason that is germane to that witness.  *Popa v. Berryhill*, 872 F.3d 901, 906-07 (9th Cir. 2017).  "[I]f the ALJ gives germane reasons for rejecting testimony by one witness, the ALJ need only point to those reasons when rejecting similar testimony by a different witness."  *Molina*, 674 F.3d at 1114 (citations omitted).

## 2.    Analysis

F.N.P Erickson opined Plaintiff was limited to less than sedentary exertion, would need to alternate between sitting and standing, could only occasionally balance with no other postural activities, and was restricted to frequent manipulative activities.  (AR 405–406.)  The ALJ provided three reasons for rejecting F.N.P Erickson's opinion.  (AR 39.)  First, he noted F.N.P Erickson "is not an acceptable medical source and lacks the medical proficiency to render a reliable opinion on [Plaintiff's] limitations."  (AR 39.)  This is not a germane reason to discount other medical source testimony.  *See, e.g., Haagenson v. Colvin*, 656 F. App'x 800, 803 (9th Cir. 2016) ("The ALJ also failed to provide germane reasons for rejecting the opinions of Haagenson's nurse and counselor, who constitute 'other sources' that can provide evidence about the severity of Haagenson's impairments and how they affect her ability to work.  The only reason that the ALJ offered for rejecting their opinions is that they are not 'acceptable medical sources' within the meaning of the federal regulation.  However, the regulation already presumes that nurses and counselors are non-acceptable medical sources, yet still requires the ALJ to consider them as 'other sources.'"); *Gia M. P. v. Comm'r Soc. Sec. Admin.*, Case No. 6:17-01825-MA, 2018 WL 4031606, at *10 (D. Or. Aug. 23, 2018) ("[S]imply because [a mental health professional] is not an acceptable medical source does not, on the record presently before the Court, provide a germane reason backed by substantial evidence in the record as whole, for rejecting [her] opinion.") (citing *Popa*, 872 F.3d at 907).

The ALJ also discounted F.N.P. Erickson's opinion because "the record contains no underlying treatment records from this source to support this opinion."  (AR 39.)  Plaintiff has not directed this Court to evidence of F.N.P. Erickson's treatment records.[8]  The ALJ's finding that F.N.P. Erickson's opinion was not supported by corresponding treatment records is therefore a finding based on substantial evidence in the record as a whole.  It is also a germane reason for failing to credit the opinion of F.N.P. Erickson.  *See Schuler v. Colvin*, No. 14–cv–05036 JRC, 2014 WL 3579674, at *7 (W.D. Wash. July 21, 2014) (lack of underlying treatment notes from licensed social worker is germane reason for rejecting "other source" opinion).

---

[8] In fact, Plaintiff's briefing does not address whether this reason was legally appropriate.

The other reason provided by the ALJ for discounting F.N.P. Erickson's opinion is that it is inconsistent with the record, specifically the success and effectiveness of Plaintiff's left ankle and left knee surgeries and his activities of daily living. (AR 39.) The treating records show Plaintiff made "significant" and "satisfactory" progress and was "doing well" following his left ankle surgery. (AR 328–29, 631.) Plaintiff was noted to be "doing fairly well" following his first left knee surgery. (AR 888.) After Plaintiff's second knee surgery following re-injury, Plaintiff was again noted to be "doing well" and "progressing appropriately," even as recently as October 2016, when he had negative orthopedic signs, stability in his knee, and good range of motion passive and actively. (AR 927, 928, 1270.) Indeed, the record demonstrates that even F.N.P Erickson himself opined that Plaintiff's prognosis would be "good" following surgery on his left knee. (AR 406, 408–09.) While Plaintiff points to evidence in the record suggesting degeneration in Plaintiff's *right* knee (Doc. 17 at 8; Doc. 21 at 2), this is not directed to F.N.P. Erickson's opinion that Plaintiff's "*left* knee derangement" caused him limitations, which could be addressed by surgery.

The ALJ also noted Plaintiff's activities of daily living, described in the consultative examiner Dr. Cohn's April 2015 report, including taking care of personal hygiene tasks without difficulty, paying bills, handling cash appropriately, going out alone, and completing household tasks. (AR 39, 906.) That F.N.P. Erickson's opinion is inconsistent with the record is another specific and germane reason for assigning it little weight. *See Dodd v. Berryhill*, 708 F. App'x 452, 453 (9th Cir. 2018) (giving minimal weight to social worker's and mental health counselor's opinion because of conflicts between these opinions and the plaintiff's reported activities was a germane reason.) (citing *Molina*, 674 F.3d at 1111). *See also Bayliss v. Barnhart*, 427 F.3d 1211, 1218 (9th Cir. 2005) (holding that the ALJ properly discounted non-physician opinions because they were inconsistent with the objective medical evidence in the record).

In sum, the ALJ provided multiple valid reasons for discounting F.N.P Erickson's opinion that were germane to that source. Accordingly, the error the ALJ committed in discounting his opinion on the basis that he was not an acceptable medical source is harmless and does not warrant remand. *See Tommasetti*, 533 F.3d at 1038 (quoting *Robbins*, 466 F.3d at 885).

**B.     The ALJ Properly Found Plaintiff Less Than Fully Credible**

   **1.     Legal Standard**

In evaluating the credibility of a claimant's testimony regarding subjective pain, an ALJ must engage in a two-step analysis. *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009). First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment that could reasonably be expected to produce the pain or other symptoms alleged. *Id*. The claimant is not required to show that her impairment "could reasonably be expected to cause the severity of the symptom [he] has alleged; [he] need only show that it could reasonably have caused some degree of the symptom." *Id*. (quoting *Lingenfelter*, 504 F.3d at 1036). If the claimant meets the first test and there is no evidence of malingering, the ALJ can only reject the claimant's testimony about the severity of the symptoms if he gives "specific, clear and convincing reasons" for the rejection. *Id*. As the Ninth Circuit has explained:

> The ALJ may consider many factors in weighing a claimant's credibility, including (1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) the claimant's daily activities. If the ALJ's finding is supported by substantial evidence, the court may not engage in second-guessing.

*Tommasetti*, 533 F.3d at 1039 (citations and internal quotation marks omitted); *see also Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1226–27 (9th Cir. 2009). Other factors the ALJ may consider include a claimant's work record and testimony from physicians and third parties concerning the nature, severity, and effect of the symptoms of which he complains. *Light v. Social Sec. Admin.*, 119 F.3d 789, 792 (9th Cir. 1997).

The clear and convincing standard is "not an easy requirement to meet," as it is "'the most demanding required in Social Security cases.'" *Garrison v. Colvin*, 759 F.3d 995, 1015 (9th Cir. 2014) (quoting *Moore v. Comm'r of Social Sec. Admin.*, 278 F.3d 920, 924 (9th Cir. 2002)). General findings are not sufficient to satisfy this standard; the ALJ "'must identify what testimony is not credible and what evidence undermines the claimant's complaints.'" *Burrell v. Colvin*, 775 F.3d 1133, 1138 (9th Cir. 2014) (quoting *Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1995)).

## 2.    Analysis

The ALJ found Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms." (AR 36.) The ALJ also found that "[Plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record . . . ." (AR 36.) Since the ALJ found Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," the only remaining issue is whether the ALJ provided "specific, clear and convincing reasons" for Plaintiff's adverse credibility finding. *See Vasquez*, 572 F.3d at 591. Plaintiff challenges the ALJ's finding that Plaintiff's credibility was undermined by several factors: the abilities he demonstrated in daily activities that were in excess of his allegations of disability; the lack of objective medical evidence supporting the use of a cane to ambulate; and the existence of work activity after the alleged onset date. (AR 37–38.) The Court takes each finding in turn.

### a.    Inconsistencies with Activities of Daily Living

The ALJ found that Plaintiff's alleged inability to perform activities of daily living due to physical symptoms is "inconsistent with other evidence in the record." (AR 38.) It is appropriate for an ALJ to consider a claimant's activities that undermine claims of totally disabling pain in making the credibility determination. *See Fair v. Bowen,* 885 F.2d 597, 603 (9th Cir. 1989); *Morgan v. Comm'r of Soc. Sec. Admin*., 169 F.3d 595, 600 (9th Cir. 1999); *Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001) *See also Thomas v. Barnhart*, 278 F.3d 947, 958–59 (9th Cir. 2002) (An ALJ may support a determination that the claimant was not entirely credible by identifying inconsistencies between the claimant's complaints and the claimant's activities of daily living.). It is well-established that a claimant need not "vegetate in a dark room" to be deemed eligible for benefits. *Cooper v. Bowen*, 815 F.2d 557, 561 (9th Cir. 1987). However, if a claimant is able to spend a substantial part of his day engaged in pursuits involving the performance of physical functions that are transferable to a work setting, a specific finding as to this fact may be sufficient to discredit an allegation of disabling excess pain. *Fair*, 885 F.2d at 603. "Even where the claimant's activities suggest some difficulty functioning, they may be grounds for discrediting the claimant's testimony to the extent that they contradict claims of a totally debilitating

impairment." *Molina*, 674 F.3d at 1113.

According to the ALJ, Plaintiff contends that has difficulties with physical exertion and postural activities and claims that he "has serious difficulties and requires much assistance with personal care and household chores" due to his physical impairments. (AR 36, 38, 56, 58, 270, 271, 272, 285, 288, 289.) The ALJ further noted that Plaintiff asserts he can only walk or stand five minutes at a time, can only sit one hour at a time, and he has to stop an activity every 30 minutes due to pain. (AR 36, 272, 288.) Plaintiff testified that he requires a hand-held device for ambulation and stability most of the time since 2011 and falls once or twice a month. (AR 36, 66.)

However, in evaluating Plaintiff's credibility, the ALJ cited activities of daily living that were inconsistent with Plaintiff's testimony concerning the severity of his symptoms and impairments. The ALJ noted, and the record reflects, in April 2015 Plaintiff reported being able to take care of personal hygiene tasks on a daily basis without difficulty, pay bills, handle cash appropriately, go out alone, and complete household tasks. (AR 38, 906.) Plaintiff also admitted in June 2015 that he could "take care of personal needs," even though it took "more time and caution." (AR 309.) The ALJ also noted that in late 2016—following Plaintiff's left ankle and left knee surgeries—Plaintiff took a trip by car to Reno, Nevada, which is over 200 miles away from his home in Modesto, California. (AR 38, 60–61.)

The Court finds Plaintiff's admitted daily activities were reasonably considered by the ALJ to be inconsistent with his claims of inability to perform personal care tasks and household chores due to his alleged impairments. The ALJ also reasonably found Plaintiff's assertions that he cannot walk or stand for more than a few minutes and cannot sit for more than an hour were undermined by his activities, including his lengthy trip by car to Reno, during which he stopped every 30 minutes, not because of his alleged impairments, but due to his son's carsickness. (AR 60–61.) Even if these activities do not rise to the level of transferable work skills, as Plaintiff suggests, *see* Doc. 17 at 10, they are inconsistent with allegations of completely debilitating impairment. *Molina*, 674 F.3d at 1113. To be sure, the evidence of Plaintiff's daily activities in this case may be interpreted more favorably to him. However, this evidence is susceptible to more than one rational interpretation, and therefore the ALJ's conclusion must be upheld. *See Burch*, 400 F.3d at 679.

1   Accordingly, the inconsistencies between Plaintiff's activities of daily living and his complaints

2   was a clear and convincing reason to find his testimony not credible with regard to his symptoms.

3   *See Stubbs-Danielson v. Astrue*, 539 F.3d 1169, 1175 (9th Cir. 2008) (finding that the ALJ

4   sufficiently explained his reasons for discrediting the claimant's testimony because the record

5   reflected that the claimant performed normal activities of daily living, including cooking,

6   housecleaning, doing laundry, and helping her husband managing finances).

7                              **b.      Objective Medical Evidence**

8          The ALJ properly rejected Plaintiff's claims that he requires a hand-held assistive device

9   to ambulate as not supported by the objective medical evidence.[9]  (AR 37–38.)  "[T]he Ninth

10  Circuit has repeatedly emphasized that, 'in evaluating the credibility of pain testimony after a

11  claimant produces objective medical evidence of an underlying impairment, an ALJ may not

12  reject a claimant's subjective complaints based *solely* on a lack of medical evidence to fully

13  corroborate the alleged severity of pain.'"  *Ondracek v. Comm'r of Soc. Sec.*, Case No. 1:15–cv–

14  01308–SKO, 2017 WL 714374, at *8 (E.D. Cal. Feb. 22, 2017) (quoting *Burch*, 400 F.3d at 680);

15  *see also, e.g., Rollins*, 261 F.3d at 857 ("[S]ubjective pain testimony cannot be rejected on the

16  sole ground that it is not fully corroborated by objective medical evidence . . . .").  Nonetheless,

17  "lack of medical evidence . . . is a factor that the ALJ can consider in his credibility analysis."

18  *Burch*, 400 F.3d at 681.  *See also Moisa v. Barnhart*, 367 F.3d 882, 885 (9th Cir.2004); *Morgan*,

19  169 F.3d at 600.  Stated differently, "[a]lthough the inconsistency of objective findings with

20  subjective claims may not be the sole reason for rejecting subjective complaints of pain, it is one

21  factor which may be considered with others."  *Salas v. Colvin*, No. 1:13–cv–00429–BAM, 2014

22  WL 4186555, at *6 (E.D. Cal. Aug. 21, 2014) (citations omitted).

23         Here, the record shows Plaintiff was prescribed assistive devices to use while recovering

24  from his knee and ankle surgeries.  (AR 298, 329, 447.)  Plaintiff testified that he started using a

25  cane in 2015, following his second knee surgery, for stability, and that he has required an assistive

26

27  ───────────────
    [9] Contrary to Plaintiff's assertion (*see* Doc. 17 at 12; Doc. 21 at 5), the Ninth Circuit's opinion in *Brown-Hunter v.
    Colvin*, 806 F.3d 487, does not control here because here the ALJ's opinion specifically identified the testimony of
28  Plaintiff the ALJ found not credible, namely, the allegation that Plaintiff "needs a hand-held assistive device to
    ambulate."  (AR 37.)

device for ambulation at least 85% of the time since 2011. (AR 64, 66.) However, such claim is belied by the substantial evidence in the medical record as discussed by the ALJ: as set forth more fully above, *see* Section IV.A.2, *supra*, the treating records show Plaintiff made "significant" and "satisfactory" progress and was "doing well" following his left ankle and left knee surgeries, even as recently as October 2016. (AR 328–29, 631, 888, 927, 928, 1270.) Objective testing of Plaintiff's right knee in March 2015 showed "mild to moderate" softening of cartilage in the kneecap, with no evidence of dislocation. (AR 893.) Examination of Plaintiff's right knee the same month demonstrated a negative testing signs and full flexion and extension. (AR 883–84.) He was prescribed only conservative treatment of pain medication and additional physical therapy exercises. (AR 884.) Plaintiff was observed to have normal gait in August and November 2013 and again in January 2015. (AR 371, 610, 902.)

The ALJ noted, and the record reflects, that no physician prescribed long-term use of an assistive device for ambulation or balance. (AR 37.) While Plaintiff asserts that "there is no requirement that a cane be prescribed by a doctor," (Doc. 17 at 11), Social Security Ruling 96-9P instructs for an ALJ "[t]o find that a hand-held assistive device is medically required, there must be medical documentation establishing the need for a hand-held assistive device to aid in walking or standing, and describing the circumstances for which it is needed (i.e., whether all the time, periodically, or only in certain situations; distance and terrain; and any other relevant information)." TITLES II & XVI: DETERMINING CAPABILITY TO DO OTHER WORK-IMPLICATIONS OF A RESIDUAL FUNCTIONAL CAPACITY FOR LESS THAN A FULL RANGE OF SEDENTARY WORK, SSR 96-9p (S.S.A. July 2, 1996), 1996 WL 374185. Here, Plaintiff has not and cannot point to any medical opinion evidence in the record establishing the need for an assistive device to aid in walking or standing on a continuing basis following his two left knee surgeries. Indeed, the only opinion evidence in the record requiring the use of an assistive device for walking was given by F.N.P. Erickson *prior* to Plaintiff's first knee surgery, and even he opined that Plaintiff would be "good after surgery." (AR 406, 408–09.)

While it is clear that Plaintiff disagrees with the ALJ's interpretation of the medical evidence with respect to Plaintiff's need for an assistive device, it is equally clear that it is not

within the province of this Court to second-guess the ALJ's reasonable interpretation of the medical evidence, even if such evidence could give rise to inferences more favorable to Plaintiff. *See Rollins*, 261 F.3d at 857 (citing *Fair v. Bowen*, 885 F.2d 597, 604 (9th Cir. 1989)). The Court therefore finds that the lack of objective medical evidence to corroborate the extent of Plaintiff's asserted requirement of a cane for ambulation was a clear and convincing reason to discredit Plaintiff's testimony on that subject. *Cf. Gonzalez v. Astrue*, No. 1:11–cv–01473–SKO, 2013 WL 394415, at *14 (E.D. Cal. Jan. 30, 2013).

### c.     Work Activity

Plaintiff's remaining argument, made in his reply brief, is that his "part-time work attempt" after the alleged onset date is not a valid clear and convincing reason for the adverse credibility finding. (*See* Doc. 21 at 4.) The ALJ discounted Plaintiff's credibility on this basis because the record showed work activity after the alleged onset date that, although did not rise to the level of substantial gainful activity, "indicat[ed] that [Plaintiff] had the capacity to perform some work." (AR 38.) Plaintiff worked for approximately three months as a tax preparer for H&R Block in 2012 and 2013, after his alleged onset date. (AR 52–53, 237, 244, 249.) Plaintiff also worked in 2014 for a temp agency. (AR 53, 237, 244, 247, 249)

Working after the alleged disability onset date does not, per se, indicate Plaintiff is not disabled. *See, e.g., Lingenfelter*, 504 F.3d at 1038 ("[i]t does not follow from the fact that a claimant tried to work for a short period and, because of his impairments, failed, that he did not then experience pain and limitations severe enough to preclude him from maintaining substantial gainful employment" (emphases in original)); *Asberry v. Astrue*, No. CV 12–2565 RNB, 2013 WL 140218, at *3 (C.D. Cal. Jan. 9, 2013) (the fact that the plaintiff worked in 2008, after her alleged disability onset date in 2007, does qualify as a clear and convincing reason for not crediting her subjective pain and symptom testimony); *Risner v. Astrue*, No. ED CV 11–495–PLA, 2012 WL 204223, at *7 (C.D. Cal. Jan. 23, 2012) ("[T]he fact that plaintiff repeatedly tried to work, but was increasingly unable to do so, could support her allegations of disabling pain in her head, arms, and back, and from her neck to the scapula or rhomboid area."). Here, the record is inconclusive as to whether Plaintiff stopped working in 2012, 2013, and 2014 due to his impairments and limitations:

he testified at the hearing that he "wasn't really comfortable" working as a tax preparer because he was "anxious" and "not used to dealing with people." (AR 53.) Plaintiff also testified that he stopped working his temporary job in 2014 due to his leg being "messed up" and "they told me that I couldn't do [the job] anymore." (AR 53.) Yet Plaintiff's girlfriend's statement suggests Plaintiff was fired from his 2014 job because he stopped going due to forgetfulness. (AR 298.) Even this reason, however, may be related to anxiety and to medication side-effects. (*See* AR 299 ("The last job he had he would forget what time. He stopped going he [sic] said he had anxiety and got fired."). Thus, that Plaintiff worked for only a short period after his alleged onset date did not suggest he was without the medical issues which caused him to stop working altogether. The ALJ's reason that Plaintiff was not entirely credible because he worked after the alleged disability onset date was therefore unconvincing. *See Lingenfelter*, 504 F.3d at 1038.

However, this was not the only reason related to Plaintiff's work activity the ALJ provided. Although not addressed by Plaintiff (other than to mention it was a reason given, *see* Doc. 17 at 10), the ALJ also found Plaintiff not entirely credible because his sporadic work history prior to the alleged onset date "raises a question as to whether his continuing unemployment is actually due to medical impairments." (AR 38.) An ALJ is required to consider work history when assessing credibility. *See* 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3) (An ALJ "will consider all of the evidence presented, including information about your work record"). Evidence of a poor work history is a clear and convincing reason to discredit plaintiff's credibility. *Thomas*, 278 F.3d at 959 (upholding ALJ's negative credibility determination because, among other factors, plaintiff's "work history was spotty, at best" and she "has shown little propensity to work in her lifetime"); *Moore v. Astrue*, No. CV–08–1567–RC, 2009 WL 1330856, at *6 (C.D. Cal. May 13, 2009) (finding the ALJ correctly relied on claimant's poor work history to support an adverse credibility determination).

Here, Plaintiff earned less than $5,000 from 2008 to 2011, and earned less than $10,000 in the years 2004–2007. (AR 241.) For the year 2003, Plaintiff earned only $134.45. (AR 241. *See also* AR 295 (Plaintiff hasn't "held a job [in] over 10 years.").) The Court finds that Plaintiff's earning records constitute substantial evidence sufficient to support the ALJ's finding of poor work

history prior to the alleged date of onset, which is a valid reason to discount Plaintiff's credibility. *Thomas*, 278 F.3d at 959; *Moore*, 2009 WL 1330856, at \*6. While it is true that factor(s) other than a lack of propensity to work could account for Plaintiff's low earnings from 2004 to 2011, this Court may not "second-guess" the ALJ's credibility finding simply because the evidence may have been susceptible of other interpretations more favorable to Plaintiff. *See Tommasetti*, 533 F.3d at 1039.

Therefore, even if the ALJ erred in predicating his credibility determination in part on Plaintiff's part-time work activity after the alleged onset date, such error is harmless because the ALJ articulated other, permissible reasons for discounting Plaintiff's credibility, specifically, as set forth above, *supra*, Plaintiff's poor work history and evidence in the record that conflicted with his allegation of total disability. *See Carmickle v. Comm'r, Soc. Sec. Admin.*, 533 F.3d 1155, 1162 (9th Cir. 2008) (citing *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1197 (9th Cir. 2004)); *Tonapetyan v. Halter*, 242 F.3d 1144, 1148 (9th Cir. 2001).

In sum, because the ALJ provided multiple clear and convincing reasons supported by substantial evidence to discount Plaintiff's credibility regarding his physical and mental limitations, the ALJ's adverse credibility determination shall be affirmed.

## C. The ALJ Did Not Err in Assessing the Credibility of Plaintiff's Girlfriend's Statements

### 1. Legal Standard

Lay testimony as to a claimant's symptoms is competent evidence that an ALJ must consider, unless he expressly determines to disregard such testimony and gives reasons germane to each witness for doing so. *Lewis*, 236 F.3d at 511; *Stout*, 454 F.3d at 1053; *see also* 20 C.F.R. §§ 404.1527(f), 416.927(f). In rejecting lay witness testimony, the ALJ need only provide "arguably germane reasons" for dismissing the testimony, even if she does "not clearly link [her] determination to those reasons." *Lewis*, 236 F.3d at 512. An ALJ may reject lay witness testimony if it is inconsistent with the record. *See, e.g., id.* at 511-12 (rejecting lay witness testimony conflicting with the plaintiff's testimony and the medical record); *Bayliss*, 427 F.3d at 1218 (rejecting lay witness testimony conflicting with the medical record). The ALJ may "draw

inferences logically flowing from the evidence." *Sample v. Schweiker*, 694 F.2d 639, 642 (9th Cir. 1982). Further, "[i]f the ALJ gives germane reasons for rejecting testimony by one witness, the ALJ need only point to those reasons when rejecting similar testimony by a different witness." *Molina*, 674 F.3d at 1114.

## 2. Analysis

As noted by the ALJ (AR 39), Plaintiff's girlfriend Ms. Pink's Third-Party Adult Function Report "largely corroborates" Plaintiff's allegations, in that both Plaintiff and Ms. Pink stated that Plaintiff was less functional due to knee pain, lack of balance, and the side effects of his medication than the ALJ ultimately found. (*E.g., compare* AR 271, 290 (Plaintiff stated his medications makes him drowsy and "spaced out") *with* AR 293, 297 (Ms. Pink stated Plaintiff "always looks spaced out" and his medications make him dizzy); *compare* AR 283 (Plaintiff stated he has to sit down all day due to imbalance) *with* AR 293 (Ms. Pink reported Plaintiff is "unbalanced on his knee."); *compare* AR 285 (Plaintiff stated he needs reminders to brush his teeth and to bathe) *with* AR 294 (Ms. Pink stated she has to remind Plaintiff to brush his teeth, to bathe, and to take his medication.); *compare* AR 56, 58, 285 (Plaintiff stated he does not prepare meals because he is "always drowsey [sic].") *with* AR 294 (Ms. Pink stated Plaintiff "rarely" prepares food or meals because he is "always drowsey [sic] and unbalanced."); *compare* AR 56 (Plaintiff testified he does not drive) with AR 295 (Ms. Pink stated Plaintiff does not drive due to his medication); *compare* AR 288 (Plaintiff stated he does not socialize) *with* AR 295, 296 (Ms. Pink stated Plaintiff no longer socializes at the gym or engages in social activities because his "knees swell" and his medication makes him drowsy); *compare* AR 288 (Plaintiff stated he has to stop walking after five minutes) *with* AR 297 (Ms. Pink stated Plaintiff has to stop walking after five minutes and rest "a couple of minutes."); *compare* AR 289 (Plaintiff stated he uses crutches, a walker, and wheelchair when it "hurts to walk") *with* AR 298 (Ms. Pink stated Plaintiff uses crutches, a cane, and a brace "when his knees hurt and swell.").) The ALJ gave "little weight" to the statements made in Ms. Pink's Report because

> [Plaintiff's] girlfriend is not an acceptable medical source and lacks the medical proficiency to render a reliable opinion on [Plaintiff's] limitations. In addition, the report is inconsistent with the overall success and general effectiveness of

[Plaintiff's] left knee and left ankle surgeries. Moreover, the report is inconsistent with the MRI of [Plaintiff's] right knee, which showed no more than mild to moderate findings and no evidence of internal derangement. Furthermore, the report is inconsistent with [Plaintiff's] work activity after the alleged disability onset date and his activities of daily living as described in the consultative examination report.

(AR 39.)

The ALJ appropriately assigned reduced weight to Ms. Pink's statements because, like Plaintiff's own testimony, it was inconsistent with the medical evidence. (AR 39.) Here, as he did in properly discrediting the statements of both F.N.P. Erickson and Plaintiff, *see* Sections IV.A.2 and B.2, *supra*, the ALJ pointed to treating records demonstrating Plaintiff made "significant" and "satisfactory" progress and was "doing well" following his left ankle and left knee surgeries, even as recently as October 2016. (AR 39, 328–29, 631, 888, 927, 928, 1270.) The ALJ also noted that objective testing of Plaintiff's right knee showed only "mild to moderate" softening of cartilage in the kneecap, with no evidence of dislocation. (AR 39, 893.) In so doing, he identified sufficient evidence of Plaintiff's underlying medical condition to adequately support his conclusion that Ms. Pink's lay testimony was inconsistent with the medical evidence. *See Richardson*, 402 U.S. at 401.

The ALJ's finding that Ms. Pink's statements conflicted with the weight of the medical evidence was a proper reason for rejecting them. *Lewis*, 236 F.3d at 503 ("One reason for which an ALJ may discount lay testimony is that it conflicts with medical evidence"). One of the ALJ's additional reasons for rejecting Ms. Pink's lay testimony—that Plaintiff's daily activities are inconsistent with the limitations Ms. Pink alleges—only gives an additional, germane reason underlying his decision to discount her testimony regarding the intensity, duration, and limiting effects of Plaintiff's symptoms.[10] *See, e.g., Stubbs–Danielson*, 539 F.3d at 1175.

---

[10] The ALJ's remaining reasons for discrediting Ms. Pink's statement, i.e., that it is inconsistent with Plaintiff's work activity after the alleged onset date and it is made by a non-medical source are, as has been seen (*see* Sections IV.A.2 and B.2.c, *supra*), not proper reasons to discredit her statement. *See Lingenfelter*, 504 F.3d at 1038; *Risner*, 2012 WL 204223, at *7 (C.D. Cal. Jan. 23, 2012) (the fact that plaintiff repeatedly tried to work but was unable to do so not necessarily inconsistent with allegations of disabling pain); *Castle v. Colvin*, 567 F. App'x 495 (9th Cir. 2014) ("[A]n ALJ may not reject a lay witness's testimony solely because the witness is not an acceptable medical source."); *Barrino v. Berryhill*, No. 2:15–cv–1841 DB, 2017 WL 977670, at *11 (E.D. Cal. Mar. 14, 2017) (same). However, in view of the other, valid reasons for discounting Ms. Pink's statements, this error is harmless. *Tommasetti*, 533 F.3d at 1038 (quoting *Robbins*, 466 F.3d at 885).

1    In sum, the ALJ's reasons were properly supported by the record and sufficiently specific

2 to allow the Court to conclude that he rejected Ms. Pink's testimony on permissible grounds and

3 did not arbitrarily discredit Ms. Pink's testimony.

4    Further, because the hypothetical that the ALJ posed to the VE contained all of the

5 limitations that the ALJ found credible and supported by substantial evidence in the record, his

6 reliance on testimony the VE gave in response to the hypothetical was proper. *Bayliss*, 427 F.3d

7 at 1217–18 (citing *Magallanes v. Bowen*, 881 F.2d 747, 756–57 (9th Cir. 1989) (holding that it is

8 proper for an ALJ to limit a hypothetical to restrictions supported by substantial evidence in the

9 record)).  The ALJ therefore did not err at Step Five.

10                           **V.     CONCLUSION AND ORDER**

11    After consideration of Plaintiff's and Defendant's briefs and a thorough review of the

12 record, the Court finds that the ALJ's decision is supported by substantial evidence and is therefore

13 AFFIRMED.  The Clerk of this Court is DIRECTED to enter judgment in favor of Defendant

14 Nancy A. Berryhill, Acting Commissioner of Social Security, and against Plaintiff.

15
    IT IS SO ORDERED.
16

17 Dated:   **April 13, 2019**                          /s/ *Sheila K. Oberto*

18                                              UNITED STATES MAGISTRATE JUDGE

19

20

21

22

23

24

25

26

27

28